**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

ABOVE IT ALL ROOFING           )
CONSTRUCTION, INC.,               )
                                  )
          Plaintiff,          )
                                  )     Case No. 16-CV-00770-GKF-FHM
v.                                )
                                  )
SECURITY NATIONAL INSURANCE    )
COMPANY,                      )
                                  )
          Defendant.        )

# OPINION AND ORDER

This matter comes before the court for decision on the issue of insurance coverage. Plaintiff Above It All Roofing & Construction, Inc. and defendant Security National Insurance Company have each filed briefs and supplemental briefs on the issue. [Docs. #24, 26, 31, 32].

**I.**    **Stipulated Facts**

The parties do not dispute that Security National issued a commercial general liability insurance policy, designated policy no. NA107340101, to Above It All for an effective period of January 7, 2015 to January 7, 2016. Nor do the parties dispute the terms of that policy. *See* [Doc. #24, p. 2 ¶¶ 1-3; Doc. #24-8]. The policy includes the following relevant policy provisions:

*COMMERCIAL GENERAL LIABILITY COVERAGE FORM, CG 00 01 12 07*

*SECTION I – COVERAGES*

*COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY*

*1.*    *Insuring Agreement*

     *a.*    *We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property*

*damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:*

\*\*\*

**2.     Exclusions**

*This insurance does not apply to:*

\*\*\*

*f.     Pollution*

    *(1)     "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants."*

\*\*\*

**SECTION V – DEFINITIONS**

\*\*\*

*3.     "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.*

\*\*\*

*15.     "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.*

\*\*\*

*17.     "Property damage" means:*

    *a.     Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or*

b.     *Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.*

\*\*\*

**FORM 49-0101 07 11**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**CHANGES IN COMMERCIAL GENERAL LIABILITY**

*This endorsement modifies insurance provided under the following:*

*COMMERCIAL GENERAL LIABILITY COVERAGE PART*

A.    *Exclusion 2.f of **SECTION I – COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** is replaced by the following:*

    ***Pollution***

    (1)    *"Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.*

\*\*\*

D.    *Additional Exclusions applicable to **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY and COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY***

    *This insurance does not apply to:*

    1.    *Punitive or Exemplary Damage*

    *If a "suit" is brought against the insured for damages covered by this policy, seeking both compensatory and punitive or exemplary damages, we will afford a defense to such action. We will not have an obligation to pay for any costs, interests or damages attributable to punitive or exemplary damages. This exclusion does not apply in any state where such endorsement is expressly prohibited by state law or insurance department regulations.*

2. Asbestos

*"Bodily injury", "property damage", or "personal and advertising injury"
arising out of:*

a)  *The use of asbestos in constructing or manufacturing any good,
product or structure; or*

b)  *The removal of asbestos from any good, product or structure; or*

c)  *The manufacture, transportation, storage, service, installation,
use, sales, mining, distribution or disposal of asbestos or goods
or products containing asbestos; or*

d)  *Inhaling, ingesting or prolonged physical exposure to asbestos
or goods or products containing asbestos; or*

e)  *Any loss, cost or expense related to any of the above.*

[Doc. #24-8, p. 30-32, 42, 44, 16-17].

Further, the parties have stipulated to the following facts. Non-party Townmaker, L.L.C.
contracted with Above It All for Above It All to remove and replace the roof system on certain
real property owned by Townmaker and located at 521 Kihehah, Pawhuska, Oklahoma 74056
("Property"). *See* [Doc. #24, p. 2 ¶ 4; Doc. #24-4]. At the time Above It All was hired, the first
floor of the Property was leased to Julie O'Keefe, who operated in the leased space a business
named The Cedar Chest. *See* [Doc. #24, p. 2 ¶ 5].

On December 8, 2015, O'Keefe filed a civil lawsuit, designated case no. CJ-2015-220,
against Above It All and Townmaker in the District Court of Osage County, State of Oklahoma
("Underlying Lawsuit").[1] [Doc. #14, p. 2]. The Petition in the Underlying Lawsuit asserted three

---

[1] The Underlying Lawsuit was initiated by both Julie O'Keefe, individually, and Julie O'Keefe
doing business as The Cedar Chest. *See* [Doc. #24-1]. For ease of reference, the court will refer
to this Underlying Lawsuit as being brought by "O'Keefe."

(3) causes of action: (1) negligence – landlord liability against Townmaker; (2) negligence *per se* under 29 C.F.R. § 1910.1001(j)(3)(i)(ii)(iii) against Townmaker; and (3) negligence against Above It All. [Doc. #24-1].

The original Petition in the Underlying Lawsuit alleges the following "facts":[2]

- On February 3, 2015, during the term of the lease, The Cedar Chest was open for business. Without notice from either Defendant, Defendant Above It All Roofing and Construction began roofing construction on the building in which The Cedar Chest was located. [Doc. #24-1, ¶ 20].

- While tearing off the old roof, an approximately 24 foot lead pipe fell through the ceiling of The Cedar Chest and landed about 2 feet from one of The Cedar Chest's employees. [Doc. #24-1, ¶ 21].

- The roofers removed the pipe but left a hole in the ceiling and a broken ceiling tile hanging open from the ceiling of The Cedar Chest. [Doc. #24-1, ¶ 22].

- As removal of the old roof continued, silt, dirt, dust and debris fell from the hole in the ceiling, ceiling tiles and molding of the walls around the leased space of The Cedar Chest and covered the clothing, fixtures, display cases, furniture, and floor and floated in the air of The Cedar Chest's store exposing the employees of The Cedar Chest and Julie O'Keefe to the debris. [Doc. #24-1, ¶ 23].

- Neither Defendant placed a tarp or any other contaminant device on the second floor of the building to preclude the falling silt, dirt, dust and debris into The Cedar Chest's store. [Doc. #24-1, ¶ 24].

- As a result, silt, dirt, dust, and debris continued to fall into the store and there was no protection from further pipes or objects falling through the ceiling of The Cedar Chest's store. Therefore, The Cedar Chest was forced to close its business during the roofing job. [Doc. #24-1, ¶ 27].

- Initially, The Cedar Chest, its co-owner Julie O'Keefe, and its employees began to clean up the dust covering the store. However, The Cedar Chest and Julie O'Keefe were concerned that the dirt, silt, dust and debris covering

---

[2] Security National does not dispute the authenticity of the Petition in the Underlying Lawsuit, attached as exhibit 1 to Above It All's Opening Brief on Coverage. *See* [Doc. #26, pp. 1-4; Doc. #24-1]. However, neither party admits the truth of the allegations of the original Petition in the Underlying Lawsuit.

the store may be harmful to the Cedar Chest's employees, customers and Julie O'Keefe and decided to have professional testing done of the leased premises. [Doc. #24-1, ¶ 29].

- The testing determined that the dust covering the store contained asbestos from the old roofing materials being torn out and replaced and was extremely harmful, even deadly. [Doc. #24-1, ¶ 30].

- The Cedar Chest leased business space had to be professionally cleaned and most of the items in the store were too contaminated to be salvaged. [Doc. #24-1, ¶ 31].

- The Cedar Chest had to remain closed and had to move its business to another location where its merchandize [*sic*] was limited to only one table rather than an entire store. [Doc. #24-1, ¶ 32].

- As a result of the Defendants' actions and inactions, Plaintiff, Julie O'Keefe d/b/a The Cedar Chest, has suffered great financial harm. The Cedar Chest was forced to close its business, turn customers away, hire a professional to conduct testing for asbestos, hire a professional to abate the asbestos, and relocate its business to a much smaller consignment store where it was limited to one table for all its remaining merchandize [*sic*] that was not totally destroyed by contamination. The Cedar Chest has suffered lost sales, destruction of irreplaceable one of kind items and other significant financial losses. Also as a result of Defendants' action and inactions, Plaintiff Julie O'Keefe individually has suffered personal injury and emotional distress by breathing in and being repeatedly exposed to the deadly containment [*sic*] of asbestos dust during the roofing construction, during the cleanup efforts, and by the tracking of the deadly asbestos dust in her car and her home. [Doc. #24-1, ¶ 33].

Specific to Above It All, O'Keefe alleges that Above It All breached its duty to determine whether the Property's old roof contained asbestos and communicate such findings, and to perform its work in a workmanlike manner by "failing to ensure that a large pipe did not fall into The Cedar Chest's store, failing to place a tarp or other protective device on the second floor of the building to protect The Cedar Chest's store from falling dirt, silt, dust and debris and/or by failing to advise Plaintiffs and/or Defendant Townmaker, L.LC. that the roofing project was going to begin so that Plaintiffs could take any necessary precautions to protect the merchandize [*sic*], employees, customers or themselves." [Doc. #24-1, pp. 9-10 ¶¶ 51-55].

Above It All sought a defense and indemnity under the Security National policy for the allegations against it in the Underlying Lawsuit. [Doc. #24, p. 3 ¶¶ 10-11; Doc. #24-2]. Security National declined Above It All's request for insurance coverage under the policy, citing four policy provisions: (1) the pollution exclusion, (2) the asbestos exclusion, (3) the punitive or exemplary damage exclusion, and (4) the policy's definition of "bodily injury." [Doc. #4-2, ¶¶ 22-26].

On November 30, 2017, O'Keefe filed her Amended Petition in the Underlying Lawsuit. *See* [Doc. #31-1]. The Amended Petition removes all reference to "asbestos." Specifically, the Amended Petition alleges that Above It All breached its duty to perform the roofing job in a good and workmanlike manner by "failing to ensure that a large pipe did not fall into The Cedar Chest's store, failing to place a tarp or other protective device on the second floor of the building to protect The Cedar Chest's store from falling dirt, silt, dust and debris, and/or by failing to advise Plaintiffs and/or Defendant Townmaker, L.L.C. that the roofing project was going to begin so that Plaintiffs could take any necessary precautions to protect the merchandise, employees, customers or themselves." [Doc. #31-1, p. 7 ¶ 45].

Above It All argues that, because the Amended Petition makes no asbestos-related allegations, Security National can no longer rely on the asbestos exclusion or the pollution exclusion and therefore Security National is obligated to provide a defense to Above It All for the Amended Petition from November 30, 2017 forward (as well as for the original Petition for the reasons previously asserted). [Doc. #31, p. 5]. In response Security National requests additional briefing regarding whether the pollution exclusion remains applicable to the Underlying Lawsuit based on the Amended Petition's allegations that the sole cause of O'Keefe's damages was dust and debris. [Doc. #32, p. 3]. Additionally, Security National, for the first time, raises the issue of

the potential application of the policy's Independent Contractors Limitation Endorsement based on Above It All's apparent subcontracting out of the work at the Property. [Doc. #32, p. 2].

## II.    **Procedural History and Scope of Review**

On December 1, 2016, Above It All sued Security National in the District Court in and for Tulsa County, State of Oklahoma, alleging breach of contract and breach of the duty of good faith and fair dealing. On December 30, 2016, Security National removed the lawsuit to this court.

At the court's suggestion, the parties agreed to submit the issue of coverage—specifically the issue of Security National's duty to defend Above It All against O'Keefe's claims in the Underlying Lawsuit under the Security National policy—to judicial determination.[3] The parties filed their respective briefs on coverage [Doc. #24 and Doc. #26], and responses [Doc. #27 and Doc. #28]. The court stayed discovery as to Above It All's bad faith claim during the pendency of the coverage determination. [Doc. #23]. On December 12, 2017, Above It All supplemented its opening coverage brief to notify this court of O'Keefe's Amended Petition in the Underlying Lawsuit [Doc. #31], and on January 3, 2018, Security National filed its response to the supplement.

The court's coverage determination is not made under Fed. R. Civ. P. 56. *See* [Doc. #21]. Further, such determination does not include any opinion as to whether Security National breached the insurance contract by refusing to defend Above It All in the Underlying Lawsuit or breached its duty of good faith and fair dealing. Nor does the court consider the potential application or effect of the Independent Contractors Limitation Endorsement.[4] The court's determination is

---

[3] Security National's duty to indemnify under the insurance policy is not yet ripe. *See First Bank of Turley v. Fid. & Deposit Ins. Co. of Maryland*, 928 P.2d 298, 303 (Okla. 1996) (noting duty to indemnify requires payment of a "specified amount *upon determinable contingencies*") (emphasis added).

[4] *See infra* p. 25-26.

limited to whether, based on the stipulated facts, coverage briefing, and submitted exhibits before the court, Security National is obligated to defend Above It All in the Underlying Lawsuit.[5]  The court first analyzes the duty to defend based upon the allegations of the original Petition and coverage briefing, and then analyzes the duty to defend based on the Amended Petition and supplemental coverage briefing.

### III.   Applicable Oklahoma Law[6]

General principles of contractual interpretation govern the construction of an insurance policy.  *Dodson v. St. Paul Ins. Co.*, 812 P.2d 372, 376 (Okla. 1991).  Thus, "[a]n insurance policy, like any other contract of adhesion, is liberally construed, consistent with the object sought to be accomplished, so as to give a reasonable effect to all of its provisions, if possible."  *Id.* (footnote omitted).  "When policy provisions are unambiguous and clear, the employed language is accorded its ordinary, plain meaning; and the contract is enforced carrying out the parties' intentions."  *BP America, Inc. v. State Auto Prop. & Cas. Ins. Co.*, 148 P.3d 832, 835 (Okla. 2005) (footnote omitted).  "[N]either forced nor strained construction will be indulged, nor will any provision be taken out of context and narrowly focused upon to create and then construe an ambiguity so as to import a favorable consideration to either party than that expressed in the contract."  *Dodson*, 812 P.2d at 376 (footnote omitted).  However, when the policy language is susceptible to two

---

[5]Above It All attached thirteen (13) exhibits to its opening briefing on coverage. *See* [Doc. #24]. Security National objects to Exhibit 7, which purports to submit twenty-four "disputed" facts to the court for determination.  *See* [Doc. #24-7].  Security National further objects to some of the exhibits based on relevancy.  *See generally* [Doc. #28].  However, other than Exhibit 7, Security National does not dispute the authenticity of any of the exhibits to Above It All's opening brief on coverage and, therefore, the court will consider all of the attached exhibits except Exhibit 7.

[6] Although not stipulated by the parties, the parties do not dispute that Oklahoma law governs the interpretation of the Security National insurance policy.

constructions, without resort to rules of construction, a genuine ambiguity exists and the contract must be construed in favor of the insured and against the insurance carrier. *Id.* at 376-77.

Liability insurance policies generally impose two duties on the insurer—the duty to defend and the duty to indemnify. *See First Bank of Turley v. Fid. & Deposit Ins. Co. of Md.*, 928 P.2d 298, 302-03 (Okla. 1996). The duty to defend is broader than the duty to indemnify, and is not limited by "determinable contingencies" or the "outcome of the third-party action." *Id.* at 303-04. Rather, under Oklahoma law, "[a]n insurer has a duty to defend an insured whenever it ascertains the presence of facts that give rise to the *potential of liability* under the policy." *Id.* at 303 (emphasis in original) (internal footnote omitted). An insurer's duty to defend is determined on the basis of the allegations of the petition (and other pleadings), as well as information obtained from the insured and other sources reasonably available to the insurer. *Id.* Thus, under Oklahoma law, "[t]he duty to defend cannot be limited by the precise language of the pleadings. *The insurer has the duty to look behind the third party's allegations to analyze whether coverage is possible*." *Id.* at 303 n.15 (emphasis in original). *See also Utica Mut. Ins. Co. v. Voyles*, 277 F. App'x 809, 812 (10th Cir. 2008) ("Oklahoma does not recognize the four-corners rule followed by some courts. A court must look beyond the language of the complaint to determine whether a duty to defend exists.").

## IV.    **Application and Coverage Analysis Under the Policy to the original Petition**

Security National argues that coverage is precluded under the policy issued to Above It All for the allegations of the original Petition because: (1) the claims in the Underlying Lawsuit are predicated upon the release of asbestos, a "pollutant," and therefore the pollution exclusion applies; (2) the allegations of the Underlying Lawsuit allege damages due to asbestos such that the asbestos exclusion unambiguously applies; (3) the punitive and exemplary damages exclusion precludes coverage for the damages sought by O'Keefe from Above It All; and (4) O'Keefe's personal injury

claim (*i.e.,* emotional distress) is not "bodily injury" as defined by the policy. The court will separately consider each argument with regard to the allegations of the original Petition, and then consider the effect of subsequent information on the duty to defend. [Doc. #24-11].

### A. Pollution Exclusion

As set forth above, the Security National insurance policy includes a total pollution exclusion, subpart (1) of which precludes coverage for "'bodily injury' or 'property damage' which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time."[7] [Doc. #24-8, p. 16]. Above It All contends that the pollution exclusion is inapplicable to the allegations of the original Petition for two reasons: (1) the damages asserted in the Underlying Litigation were caused by Above It All's negligent workmanship and resultant felled pipe, as well as the alleged release of asbestos; and (2) asbestos does not qualify as a "pollutant" as defined by the policy. [Doc. #27, pp. 4- 18].

### 1. Asserted Damages

Security National argues that, because the damages sought in the original Petition in the Underlying Litigation are wholly predicated upon release or discharge of a "pollutant," coverage under the policy is precluded by the pollution exclusion. In opposition, Above It All argues that the original Petition alleges damages from Above It All's negligent workmanship, not just the release of asbestos. That is, Above It All contends that the damages asserted in the original Petition

---

[7]Subpart (1) of the pollution exclusion is subject to two exceptions which restore coverage for certain "bodily injury" or "property damage" as a result of "pollutants." [Doc. #24-8, p. 16]. Although neither party raised the exceptions to subpart (1) in their respective coverage briefing, based on this court's independent review, the exceptions to subpart (1) of the pollution exclusion are inapplicable.

were caused by two identifiable causes, one potentially excluded (asbestos) and one not, and therefore coverage is owed.

This argument requires the court to, first, consider the Security National policy's insuring agreement to determine the scope of damages generally covered under the policy and, second, to analyze the damages sought in the original Petition to determine whether the asserted damages fall within the scope of the policy's insuring agreement.

The policy's insuring agreement applies to "property damage," [Doc. #24-8, p. 30],[8] which is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property" and "[l]oss of use of tangible property that is not physically injured." [Doc. #24-8, p. 44]. Pursuant to both definitions of "property damage," "[a]ll such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."[9] [*Id.*]

Although Above It All argues that the original Petition "clearly alleged damage from the negligence of Above It All, not just damage from the alleged release of asbestos," Above It All does not identify any specific damages sought by O'Keefe related only to the negligent workmanship and not the asbestos. [Doc. #27, p. 4]. However, the court notes the original Petition alleges that "an approximately 24 foot lead pipe fell through the ceiling of The Cedar Chest," and seeks damages for destruction of the Cedar Chest's merchandise. [Doc. #24-1, ¶¶ 21, 33]. Further, the it alleges that, *prior to any indication of asbestos*, O'Keefe was forced to close her business

_____

[8]The policy's insuring agreement also applies to "bodily injury." [Doc. #24-8, p. 30].

[9]The policy's insuring agreement provides coverage only for "bodily injury" and "property damage" caused by an "occurrence," which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." [Doc. #24-8, p. 43]. Although not directly addressed by the parties in the coverage briefing, the parties do not appear to dispute that the alleged damages were caused by an "occurrence" under Oklahoma law.

because "silt, dirt, dust, and debris continued to fall into the store and there was no protection from further pipes or objects falling through the ceiling of The Cedar Chest's store." [Doc. #24-1, ¶ 27]. *See also* [Doc. #24-1, ¶¶ 28-29 (indicating that Townmaker informed The Cedar Chest when the roofing job was complete and that the Cedar Chest was "clear to start cleaning up its shop" and it was "safe to go back into the building," and that only *after* O'Keefe began cleaning did O'Keefe decide to have professional testing performed)]. Thus, the original Petition can be reasonably read to allege that the 24-foot pipe that fell through the ceiling resulted in damage to O'Keefe's leasehold and merchandise, regardless of whether asbestos fell on that merchandise. Based on these allegations, the court is persuaded that the original Petition alleges that both negligent workmanship and the release of asbestos contributed to the damages sought by O'Keefe in the original Petition, although the court cannot identify any damages solely related to negligent workmanship based on the materials before it.

Because the damages are alleged to have been the result of two causes, the court must consider the efficient proximate cause doctrine under Oklahoma law. *See Nat'l Am. Ins. Co. v. Gerlicher Co., LLC*, 260 P.3d 1279, 1286 (Okla. Civ. App. 2011) ("The efficient proximate cause doctrine applies when at least two identifiable causes combine to form a single property loss, and one is covered under the policy while the other one is excluded under the policy.").

Pursuant to the efficient proximate cause doctrine, "[i]f the insured successfully demonstrates that the proximate cause of the loss is covered under the policy, the entire loss is covered notwithstanding the fact that an event in the chain of causation was specifically excluded from coverage." *Duensing v. State Farm Fire & Cas. Co.*, 131 P.3d 127, 133 (Okla. Civ. App. 2005) (emphasis removed from original). Above It All essentially argues that, because the asserted

- 13 -

damages, including exposure to asbestos, were proximately caused by negligent workmanship, the pollution exclusion should not apply.

The court is not persuaded. Although the Oklahoma Supreme Court has never addressed the issue, the Oklahoma Court of Civil Appeals has twice held that Oklahoma law permits the parties to an insurance contract to contract around the efficient proximate cause doctrine through provisions commonly referred to as "anti-concurrent cause provisions." *See Gerlicher Co., LLC*, 260 P.3d at 1287; *Duensing,* 131 P.3d at 133-34. *See also Kelly v. Farmers Ins. Co., Inc*., 281 F. Supp. 2d 1290, 1298 (W.D. Okla. 2003) ("Among the jurisdictions that have adopted the efficient proximate cause doctrine, most permit parties to 'contract around' it."). Early cases considering "anti-concurrent cause provisions" held that, in order to effectively contract around the efficient proximate cause doctrine, the provision must "explicitly and specifically disclaim coverage for losses that arise from a combination of excluded and covered causes, regardless of the sequence in which the various causes occurred." *Duensing,* 131 P.3d at 137. Thus, in *Duensing*, an anti-concurrent cause lead-in provision, stating "[w]e do not insure under any coverage for any loss which would not have occurred in the absence of one or more of the following excluded events. We do not insure for such loss regardless of: (a) the cause of the excluded event; or (b) other causes of the loss; or (c) *whether other causes acted concurrently or in any sequence with the excluded event to produce the loss*. . .", whereas an anti-concurrent cause lead-in in the same policy, providing,"[w]e do not insure for any loss to the property described in Coverage A which consists of, or is directly and immediately caused by, one or more perils listed in items a. through n. below, regardless of whether the loss occurs suddenly or gradually, involves isolated and widespread damages, arises from natural or external forces, or occurs as a result of any combination of these," was insufficient to contract around the efficient proximate cause doctrine because that lead-in

provision "d[id] not have the same or similar language" as the first provision—"whether other causes acted concurrently or in any sequence with the excluded event to produce the loss." *Id.* at 132, 134, and 137 (emphasis added).[10]

However, more recent cases interpreting "anti-concurrent cause provisions" have abandoned the requirement that the provision specifically disclaim coverage "regardless of the sequence in which the various causes occurred," and have enforced the circumventing provisions so long as they are clear, unambiguous, and not hidden in the policy. *See Mid-Continent Cas. Co. v. Union Ins. Co.,* 445 F. App'x 133, at *5 (10th Cir. 2011) (unpublished) (citing *Gerlicher* and applying Oklahoma law); *Atain Specialty Ins. Co. v. Tribal Constr. Co.,* 912 F. Supp. 2d 1260, 1271 (W.D. Okla. 2012); *Gerlicher Co., LLC,* 260 P.3d at 1287. Thus, in *Mid-Continent v. Union Insurance,* the Tenth Circuit held that the phrase "provided the 'bodily injury' . . . is *caused, in whole or in part,* by [the insured] . . ." effectively avoided application of the efficient proximate cause doctrine. *Mid-Continent Cas. Co.,* 445 F. App'x at *5 (emphasis added). In *Atain Specialty,* Judge DeGiusti of the U.S. District Court for the Western District of Oklahoma concluded that "the phrase *'in connection with'* [in an automobile exclusion] reasonably encompasses situations where more than one cause is involved in a loss, and the only fair and reasonable construction of that phrase in the context of the CGL Policy's Auto Exclusion is to negate operation of the efficient proximate cause doctrine." *Atain Specialty Ins. Co.,* 912 F. Supp. 2d at 1271 (emphasis added).

The Security National policy's pollution exclusion precludes coverage for "'[b]odily injury' or 'property damage' which *would not have occurred in whole or part* but for the . . . . escape of 'pollutants' at any time." [Doc. #24-8, p. 16]. The court concludes that the only fair

---

[10] In *Duensing,* "lead-in" provisions referred to clauses immediately preceding, and modifying, the relevant exclusions. *See id.* at 133.

and reasonable construction of the phrase "would not have occurred in whole or part" is to preclude coverage in situations where the asserted damages were concurrently caused by "pollutants" and "non-pollutants." The pollution exclusion's requirement of "but for" causation, rather than proximate cause, further indicates an intent to avoid application of the efficient proximate cause doctrine. Thus, because the language of the language of the pollution exclusion was "neither masked by technical or obscure language nor hidden in the policy," *see Gerlicher Co., LLC*, 260 P.3d at 1287-88, the court concludes that the pollution exclusion avoids application of the efficient proximate cause doctrine. Because the alleged cause of the asserted damages does not preclude application of the pollution exclusion, it is next necessary to consider whether "asbestos" qualifies as a "pollutant" as defined by the Security National policy.

### 2. "Pollutant"

The Security National policy defines "pollutant" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed." [Doc. #24-8, p. 44].

The parties do not cite, nor has the court identified, any case determining whether "asbestos" qualifies as "pollutant" under Oklahoma law. Further, extra-jurisdictional courts that have considered the issue are divided. *See R.T. Vanderbilt Co., Inc. v. Hartford Accident & Indem. Co.*, 156 A.3d 539, 638-39 (Conn. App. Ct. 2017) (collecting cases).

Above It All argues that, because the Security National policy's definition of "pollutant" does not specifically include asbestos, asbestos cannot be a "pollutant" for purposes of the policy's coverage. [Doc. #27, pp.4-5]. The court is not persuaded that an Oklahoma court would require an insurance policy to include every potential "pollutant" in its definition of the term. *Compare State Auto Mut. Ins. Co. v. Flexdar, Inc.*, 964 N.E.2d 845 (Ind. 2012) ("Indiana decisions have

been consistent in recognizing the requirement that language of a pollution exclusion be explicit.").

The Oklahoma Court of Civil Appeals's decision in *Certain Underwriters at Lloyds v. B3, Inc.*, 262 P.3d 397 (Okla. Civ. App. 2011), although not precedential[11], is instructive. The insurance policy at issue in *B3, Inc.* included a definition of "pollutants" identical to that included in the Security National policy. *Id.* at 399. In that case the insured argued that because treated wastewater was not specifically included in the definition of "pollutants," damages due to treated waste water were not excluded by the policy's pollution exclusion. *Id.* The Court of Civil Appeals disagreed, reasoning:

> Landowners' underlying lawsuit is premised upon damages allegedly sustained due to the polluting nature of the wastewater containing human waste and other raw or improperly treated wastes and contaminants released or discharged within the plain and ordinary meaning of those terms. An ambiguity is created only by adopting the strained construction proposed by [the insureds]. "An insured cannot insist upon a strained construction of relevant policy language in order to claim a patent ambiguity exists nor can it contradict the written instrument's plain terms under the guise of latent ambiguity."

*Id.* at 400-01 (quoting *Bituminous Cas. Corp. v. Cowen Constr., Inc.*, 55 P.3d 1030, 1034 (Okla. 2002)). *See also Markel Ins. Co., Inc. v. Burns*, No. CIV-09-185-SPS, 2011 WL 1344131 (E.D. Okla. Apr. 8, 2011) (finding by implication that pesticides were "pollutant"). Accordingly, the court will consider whether asbestos is a "thermal irritant" or "contaminant."

The policy does not define "irritant" or "contaminant." However, "irritant" is commonly understood as something "tending to produce irritation or inflammation." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 1197 (1981). *See also* FUNK & WAGNALLS NEW STANDARD DICTIONARY OF THE ENGLISH LANGUAGE, 1296 (1946) ("[a] mechanical, chemical or pathological

---

[11] *See* Okla. Sup. Ct. Rule 1.200(e).

agent of inflammation, pain or tension"). "Contaminant" is commonly defined as "something that contaminates," meaning "to soil, stain, corrupt, or infect by contact or association." WEBSTER'S, at 491. Courts have long recognized the potentially irritating and infectious effects of exposure to asbestos. *See, e.g., Case v. Fireboard Corp.*, 743 P.2d 1062 (Okla. 1987); *Norfolk & W. Ry. Co. v. Ayers*, 538 U.S. 135 (2003). "Asbestos" qualifies as both an "irritant" or "contaminant," and therefore a "pollutant," based on the common meanings of those terms.[12]

However, the court's inquiry does not end here. Citing a New York state court's decision in *Great American Restoration Services, Inc. v. Scottsdale Insurance Company,* 911 N.Y.S.2d 142 (N.Y. App. Div. 2010), Above It All argues that, *in the context of the specific Security National insurance policy issued to it*, the policy's definition of "pollutant" is rendered ambiguous by virtue of the policy's inclusion of an asbestos-specific exclusion. In the *Great American Restoration* decision, the policy included specific exclusions for both asbestos and pollution. The asbestos exclusion stated that coverage did not apply "to 'bodily injury' or 'property damage' arising out of the 'inhal[ation]' or 'prolonged physical exposure to' asbestos, the 'use' of asbestos in

_____

[12] The court is not persuaded by Above It All's assertion that "not all asbestos is a harmful irritant or contaminant," because non-friable asbestos is not considered harmful, even though Above It All concedes that friable asbestos is hazardous. [Doc. #27, p. 17]. The Tenth Circuit has recognized that friable asbestos includes previously nonfriable material "after such previously nonfriable material becomes damaged to the extent that when dry it may be crumbled, pulverized or reduced to powder by hand pressure." *Adams-Arapahoe Sch. Dist. No. 28-J v. GAF Corp.*, 959 F.2d 868, 870 (10th Cir. 1992) (quoting 40 C.F.R. § 763.83 (1990)). Presumably, many pollutants may not be harmful while in a controlled form, but become hazardous upon damage. Further, those jurisdictions that have concluded that asbestos is not a "pollutant" generally have not based their decisions on the character of asbestos but, rather, that the release of asbestos does not result in environmental injury as required for application of the pollution exclusion in those jurisdictions. *See, e.g., Owens-Corning Fiberglas Corp. v. Allstate Ins. Co.*, 660 N.E.2d 746, 750-51 (Ohio Ct. C.P. 1993); *Continental Cas. Co. v. Rapid-American Corp.,* 609 N.E.2d 506 (N.Y. 1993). Under Oklahoma law, however, application of the pollution exclusion is not limited to damage to the general environment. *Cowen Constr., Inc.,* 55 P.3d at 1034.

construction, the 'removal' of asbestos from products or structures, or the 'manufacture, sale, transportation, storage, or disposal' of asbestos or products containing asbestos." *Id*. at 144. The pollution exclusion precluded coverage for "'bodily injury' or 'property damage' arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants,'" defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." *Id.* The court concluded that interpreting "pollutant" to include asbestos created an ambiguity because "[a]lthough asbestos may be a thermal irritant . . . the term 'asbestos' is not specifically included within the definition of a 'pollutant' as defined under the terms of the policy." *Id.* at 146. Further, the court concluded that including asbestos within the policy's definition of "pollutant" would "render the specific asbestos exclusion meaningless, in violation of settled canons of construction." *Id.*

The court is not persuaded by *Great American* for three reasons. *First*, under Oklahoma law, "policy exclusions are read seriatim; each exclusion eliminates coverage and operates independently against the general declaration of insurance coverage and all prior exclusions by specifying other occurrences not covered by the policy." *Dodson*, 812 P.2d at 377 (footnote omitted). Thus, each policy exclusion separately removes coverage. *See BP America, Inc.,* 148 P.3d at 842. Here, the asbestos exclusion removes coverage for asbestos in some circumstances; the pollution exclusion applies to further remove coverage. The purposes of the policy's definition of "pollutant" is to define specific excluded losses, not negate another plainly worded exclusion. *See BP America, Inc.*, 148 P.3d at 841.[13]

---

[13]Further, the Oklahoma Supreme Court has previously concluded that pollution exclusions are unambiguous and enforceable. *See, e.g., Kerr-McGee Corp. v. Admiral Ins. Co.*, 905 P.2d 760 (Okla. 1995). *See also Markel Ins. Co, Inc. v. Burns,* No. CIV-09-185-SPS, 2011 WL 1344131 (E.D. Okla. Apr. 8, 2011) (enforcing total pollution exclusion).

*Second*, the court is not persuaded that interpreting "pollutant" to include asbestos would render the asbestos exclusions superfluous, or vice versa. The focus of the inquiry with regard to the applicability of the pollution exclusion is whether the damages would have "occurred in whole or part" from pollution, resulting in the circumvention of the efficient proximate cause doctrine. The asbestos exclusion inquiry focuses on whether the alleged injuries "arise out of" asbestos. The court can foresee separate application of the two exclusions based on these distinct inquiries.

Third, in the majority of the cases identified by the court considering whether an asbestos-specific exclusion renders a pollution exclusion ambiguous, the courts have found no ambiguity. *See, e.g., RLI Ins. Co. v. Gonzalez,* 411 F. App'x 696 (5th Cir. 2011) (unpublished) ("The existence of a separate exclusion for asbestos does not create ambiguity in the Pollution Exclusion."). *See also Garamendi v. Golden Eagle Ins. Co*., 25 Cal. Rptr. 3d 642, 648 (Cal. Ct. App. 2005) ("In light of the widespread asbestos litigation that has been ongoing for approximately a half-century, it is not surprising that an insurer seeking to exclude coverage for asbestos claims would include an explicit provision making that exclusion unmistakably clear. The effect of such prudence, however, is not to restrict the scope of the pollution exclusion.").

For the foregoing reasons, the court concludes that the pollution exclusion in the Security National policy unambiguously applied to preclude coverage for the damages sought in the original Petition.

## B.    Asbestos Exclusion

Although the pollution exclusion initially appears applicable with regard to the allegations of the original Petition, the court will consider the asbestos exclusion. As previously mentioned, the policy includes an asbestos exclusion, which precludes coverage for "bodily injury," "property damage," or "personal and advertising injury," arising out of five (5) designated activities

enumerated in sub-paragraphs a. through e.  Security National does not dispute that sub-paragraphs a., b., c., and e. are inapplicable to coverage for the Underlying Litigation.  Accordingly, the court's analysis is limited to subparagraph d., which excludes coverage for "bodily injury," "property damage," or "personal and advertising injury," "arising out of . . . [i]nhaling, ingesting or prolonged physical exposure to asbestos or goods or products containing asbestos."  [Doc. #24-8, p. 17].

Security National argues that any "bodily injury" or "property damage" asserted by O'Keefe is precluded from coverage by reason of the asbestos exclusion.  *See* [Doc. #26, p. 13]. Although any "bodily injury" allegedly sustained by O'Keefe due to exposure to asbestos is unambiguously excluded by sub-paragraph d. of the asbestos exclusion, the court is not persuaded that sub-paragraph d. excludes coverage for allegations of "property damage."

Sub-paragraph d. applies to injury or damage due to "inhaling, ingesting, or prolonged physical exposure" to asbestos.  [Doc. #24-8, p. 17].  The alleged "property damage" to O'Keefe's merchandise clearly did not arise from the "inhal[ation]" or "ingesti[on]" of asbestos.  Thus, it is necessary to consider whether the alleged "property damage" arose from "prolonged physical exposure" to asbestos.

The Security National policy does not define "prolonged physical exposure."  [Doc. #24-8, p. 17].  Nor have Oklahoma courts.  Accordingly, this court must "determine the best-reasoned interpretation" of the phrase.  *See Liberty Mut. Ins. Co. v. E. Cent. Okla. Elec. Coop*, 97 F.3d 383, 389 (10th Cir. 1996).  In doing so, the *ejusdem generis* canon of contractual interpretation is instructive.

Pursuant to the rule of *ejusdem generis*, "when interpreting a general word that follows a series of specific words, 'those specific words restrict the meaning of the general.'"  *Id.* at 390

(quoting *State ex rel. Comm'rs of the Land Office v. Butler*, 753 P.2d 1334, 1336 (Okla. 1987)). Here, sub-paragraph d. first lists two potential causes of injuries that are specific to bodily injury— "inhalation" and "ingestion." These specific causes are followed by the more general cause "prolonged physical exposure." Pursuant to the principle of ejusdem generis, the phrase "prolonged physical exposure" is intended to encompass actions of the same general type as "inhalation" and "ingestion"—*i.e.,* bodily injuries. *See id.* Thus, the court concludes that sub-paragraph d. of the asbestos exclusion is inapplicable to allegations of "property damage." Because the original Petition clearly alleged "property damage," sub-paragraph d. of the asbestos exclusion does not preclude a duty to defend under the policy.

### C.     Punitive or Exemplary Damage Exclusion

Security National asserts that "[t]he punitive damages exclusion precludes coverage for the alleged damages sought from Above It All." [Doc. #26, p. 15]. Policy "coverage," under Oklahoma law includes two duties—the duty to defend and the duty to indemnify. However, as previously mentioned, the court is not considering the duty to indemnify at this time. Rather, the court's inquiry is limited to the duty to defend Above It All.

The punitive damage exclusion states: "If a 'suit' is brought against the insured for damages covered by this policy, seeking both compensatory and punitive or exemplary damages, [Security National] will afford a defense to such action." [Doc. #24-8, p. 17]. The original Petition in the Underlying Lawsuit seeks both compensatory and punitive damages against Above It All. [Doc. #24-1, ¶ 55]. The punitive damage exclusion is unambiguous, and does not exclude a duty to defend Above It All under the Security National policy.

### D.     "Bodily Injury"

In their final argument, Security National asserts that the original Petition in the Underlying Litigation does not allege "bodily injury" as defined by the policy.  Because this court has found that the original Petition in the Underlying Lawsuit alleges "property damage," whether the original Petition asserts "bodily injury" is not determinative as to the duty to defend.  Accordingly, the court will not decide the issue at this time.

### E.     Effect of Subsequent Information

Although the court concludes that the pollution exclusion effectively circumvents the efficient proximate cause doctrine and applies to the allegations of the original Petition, based on the materials submitted to this court, it is clear that, at some point, questions were raised as to the presence or existence of *any* asbestos at the Property.    Specifically, the materials submitted included a March 26, 2017 report prepared by Pinnacle Environmental Solutions & Consulting finding: (1) friable asbestos containing material below the detection limit; and (2) no non-friable asbestos containing material present.  [Doc. #24-11].  The March 26, 2017 report was forwarded via e-mail to counsel for Security National on April 7, 2017.  [Doc. #24-12].

As previously mentioned, under Oklahoma law, the duty to defend determination is not limited to the allegations of the pleadings, but is determined "on the basis of information gleaned from the petition (and other pleadings), from the insured and from other sources available to the insurer."    *First Bank of Turley,* 928 P.2d at 303 (emphasis removed from original) (citation omitted).  "An insurer has a duty to defend an insured whenever it ascertains *the presence of facts* that give rise to the *potential* of liability under the policy."  *Id.* (emphasis added) (internal citation omitted).  Thus, an insurer cannot shut its eyes to *facts* triggering the duty to defend, in favor of reliance upon the complaint's allegations.  *Id.* at 303 n.13.  "'[E]ven though the pleadings do not

show coverage, where known or reasonably ascertainable facts become available that show coverage the duty to defend devolves upon the insured.'" *Id.* at 303 n.15 (quoting 7 Appleman, *Insurance Law & Practice* § 4684.01 at 95 (1979)).

Under the circumstances of this case, the court concludes that facts indicating that asbestos was **not** present at the Property, coupled with the original Petition's allegations of negligent workmanship, give rise to the potential for liability under the policy to which no exclusion would apparently apply.[14] Thus, evidence indicating that damage occurred *absent the presence of any asbestos* gives rise to the potential for damages within the policy's coverage and triggered Security National's duty to defend.[15] *See First Bank of Turley*, 928 P.2d at 304 n.16. Accordingly, the court concludes that the duty to defend was triggered by the allegations of the original Petition in the Underlying Lawsuit on the date the March 26, 2017 report was forwarded by email to counsel

---

[14] In its response to Above It All's supplemental brief on coverage, Security National raises the issue of whether the pollution exclusion would apply based on allegations that O'Keefe's asserted damages were caused by dirt, dust and debris. *See* [Doc. #32, p. 3]. Essentially, Security National belatedly attempts to assert that dirt, dust and debris constitute "pollutants" as defined by the policy. The original Petition alleged that dirt, dust and debris, in part, caused O'Keefe's damages. *See, e.g.,* [Doc. #24-1, ¶¶ 23 and 54]. However, Security National's denial letters do not assert that dirt, dust and debris are "pollutants." *See* [Doc. #24-3, p. 6 ("The Pollution Exclusion also precludes coverage for the alleged damages because the petition alleges that *asbestos* caused contamination.") (emphasis added); Doc. #24-9]. Nor has Security National previously argued for application of the pollution exclusion based on dirt, dust and debris before this court. As a result, under well-established Oklahoma law, Security National is precluded from asserting the coverage defense that dust, dirt, and debris are "pollutants" for purposes of the policy's pollution exclusion. *See Buzzard v. Farmers Ins. Co., Inc.*, 824 P.2d 1105 (Okla. 1991) (overturning the jury's verdict on this ground because the defense of comparative negligence "was neither internally noted by [the insurer] nor communicated to plaintiffs as a reason for delay or denial of the claim").

[15] For this reason, the court is not persuaded by Security National's assertion that "the issue here is whether Plaintiff in the underlying action alleged that its store and goods were contaminated by asbestos." [Doc. #28, p. 4]. Oklahoma has not adopted the four-corners rule, and an insurer must look beyond the allegations of the pleadings to determine its duty to defend. *Utica Mut. Ins. Co. v. Voyles*, 277 F. App'x 809, 812 (10th Cir. 2008)

for Security National such that Security National was made aware of facts giving rise to the potential for liability under the policy—April 7, 2017.

**V.**   **Application and Coverage Analysis Under the Policy to the Amended Petition**

As previously stated, the Amended Petition removes all references to asbestos from the original Petition.  *See* [Doc. #31-1].  Specifically, the Amended Complaint alleges that Above It All breached its duty to perform the roofing job in a good and workmanlike manner by "failing to ensure that a large pipe did not fall into The Cedar Chest's store, failing to place a tarp or other protective device on the second floor of the building to protect The Cedar Chest's store from falling dirt, silt, dust and debris and/or by failing to advise Plaintiffs and/or Defendant Townmaker, L.L.C. that the roofing project was going to begin so that Plaintiffs could take any necessary precautions to protect the merchandize, employees, customers or themselves."  [Doc. #31-1, p. 7 ¶ 45].

Absent allegations of asbestos, neither the pollution exclusion nor the asbestos exclusion applies.  Further, for the same reasons discussed with regard to the original Petition, the punitive or exemplary damage exclusion and definition of "bodily injury" do not preclude the duty to defend.  Thus, the allegations of the Amended Petition trigger the duty to defend Above It All for the Underlying Lawsuit.

**VI.**   **Subcontractor Issue and Independent Contractors Limitation Endorsement**

As previously mentioned, in its January 3, 2018, response to Above It All's supplemental coverage brief, Security National, *for the first time*, states that Above It All subcontracted the work at the Property to a third-party and, as a result, questions are raised regarding application of the policy's Independent Contractors Limitation Endorsement.  *See* [Doc. #32, p. 2].

As an initial matter, the court questions why the potential effect of a subcontractor is only now being raised, and why Security National was not aware of the alleged subcontractor until September 25, 2017.  That being said, the court notes that the subcontractor's insurance policy has

not been provided as evidence to this court, nor is the subcontractor (or its insurer) a party to these proceedings. The subcontractor is not included in the Underlying Lawsuit and Above It All makes no reference to the subcontractor in its Answer to O'Keefe's Amended Petition.[16] The court has no information as to the amount of defense costs incurred by Above It All in the Underlying Lawsuit. Thus, the court is without sufficient evidence to determine the effect, if any, of the Independent Contractors Limitation Endorsement on the court's determination of the duty to defend as set forth in this order.

**VII.**     <u>**Conclusion**</u>

      WHEREFORE, the court concludes that the duty to defend Above It All for the Underlying Lawsuit under the Security National policy was triggered by the allegations of both the original Petition and Amended Petition.

      IT IS FURTHER ORDERED, that the parties shall appear before the court for a status conference on January 11, 2018 at 10:30 a.m. to discuss the potential effect of the Independent Contractors Limitation Endorsement on the court's determination of the duty to defend as set forth in this order.

      DATED this 5th day of January, 2018.

                                GREGORY K. FRIZZELL, CHIEF JUDGE
                                UNITED STATES DISTRICT COURT

---

[16] The court takes judicial notice of matters that are public record in the Underlying Lawsuit. *See St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("[F]ederal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.").